UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,   CASE NO. 00-6190-CR-DIMITROULEAS

    Plaintiff,

vs.

RUDOLF McKENZIE,

    Defendant.

_____/

FILED by _____ D.C.

AUG 2 5 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## ORDER

THIS CAUSE having been heard upon Defendant's August 15, 2000 Motion to Suppress [DE-19]. The Court having considered the Government's Response [DE-22], and the Court having received testimony from Inspector Linda Banks, Inspector Irene Rishel, Inspector Joseph Castrenze, Jr., Inspector Carol Gladden, and Shernett McKenzie at an evidentiary hearing held on August 23 and 25, 2000, having reviewed exhibits, having determined credibility of witnesses, having heard arguments of counsel and being otherwise fully advised, finds as follows:

1.     On June 27, 2000, the Defendant, Rudolf McKenzie, and Granville Williams, the step-son of a relative of the Defendant, flew non-stop from Jamaica to Ft. Lauderdale, Florida on Air Jamaica Flight 089. Flight 089 is a high-risk flight because it comes from a source country. There have been prior arrests on that flight of people smuggling drugs in their alimentary canals.

2.     The Defendant was met at the "point" by Inspector Banks, asked four questions, and released to an Agriculture Inspector. After clearing that area, he apparently left the customs area of the airport.

1



3.      The last person off the plane was Granville Williams, a 17 year-old male. He had been identified by the computer as a suspicious passenger based upon a prior no-show at the airport, and a prior cancellation of a reservation. Williams indicated that he had been "sorta" traveling with someone. When Inspector Banks could not understand the name of Williams' travel partner, she asked Williams to write down the name. Williams wrote down the Defendant's name, and Banks confirmed on the computer that the Defendant and Williams had both been on the flight and that they were on the same reservation together. Banks inspected Williams' luggage, and a suspicious lotion bottle was located. A drug-detecting dog alerted to both Williams and the lotion. Ten pellets were located in Williams' crotch area, and other pellets were located in the lotion. The pellets tested positive for cocaine.

4.      Since Williams was a minor, Banks went to locate the Defendant, who was believed to be related to Williams[1].

5.      The Defendant was located outside of the Customs area on the airport sidewalk. The Defendant voluntarily[2] agreed to accompany Inspector Richel back into their Custom's area. A records check revealed that the Defendant had an extensive criminal history (convictions for attempted murder and kidnapping). The Defendant's wife was contacted and after some difficulty[3], a suitcase was retrieved from their car. A search of the suitcase proved negative for drugs.

6.      Inspector Gladden obtained permission from Norma Sears, the Port Director, to seek

---

[1]     Williams told Inspector Rishel that the Defendant was his uncle/cousin and was waiting outside for him.

[2]     The Defendant seemed upset at his relative for his having brought drugs into this country.

[3]     The Court did not find Shernett McKenzie's testimony to be credible.

2

permission from the Defendant for an x-ray. Sears was told that the Defendant had claimed that both sides of his family attended a family reunion in Jamaica; she was also informed of the Defendant's salary. Custom's policy requires the Port Director to obtain legal counsel's approval prior to seeking a consent for x-rays. The Defendant was read a consent form for an x-ray of his torso. There were no threats. The Defendant voluntarily signed the consent form, saying that he was not guilty and that he did not swallow any drugs. However, once at the hospital, the Defendant professed a fear of needles and withdrew his consent. Inspector Glidden explained that Broward General Hospital did not have a Ward D and that if he passed the x-ray, he could go home, but if he refused the x-ray, then he would have to go to Jackson Memorial Hospital in Miami where he could be released after passing three clear bowel movements. The Defendant changed his mind and consented to the x-ray, which revealed pellet shaped objects in his stomach. Over a period of several days, the Defendant passed cocaine pellets at the hospital.

7.   It was stipulated that the Defendant was read his *Miranda* rights on July 7, 2000; he waived those rights and provided a voluntary statement.

8.   A traveler's expectation of privacy is less at the border than in the interior of this country. *United States v. Montoya de Hernandez*, 473 U.S. 531, 539-40 (1985). A search at an airport near the custom's office is a valid border search conducted at the functional equivalent of the border. *United States v. Ogbuehi*, 18 F.3d 807, 812 (9th Cir. 1994); *Almeida-Sanchez v. United States*, 413 U.S. 266, 274 (1973). There was no opportunity to tamper with the drugs. Nothing was found in the Defendant's suitcase, so that with the time delay it was reasonable to believe that the Defendant had not left the airport and then returned. It was reasonable to believe that any swallowed drugs were still in the Defendant. Once the Defendant was located outside the Custom's office, after ascertaining that his traveling relative possessed unswallowed pellets, Customs searched the

3

Defendant at the first practical point. *United States v. Hill*, 939 F.2d 934, 938 (11th Cir. 1991). The agents were justified in believing that pellets had been swallowed by the Defendant and/or Williams. *United States v. Gonzalez-Rincon*, 36 F.3d 859, 863-64 (9th Cir. 1994).

9. Moreover, the Defendant voluntarily returned to the Customs area. He gave some suspicious answers to questions, and he voluntarily consented to being x-rayed. Although he later temporarily withdrew that consent; he then again voluntarily agreed to the x-ray. Even if the Court were to have determined that the representation that the Defendant would have to go to Ward D at Jackson Memorial Hospital if he did not consent to the x-ray destroyed the voluntariness of his consent, at the point of his withdrawal of the consent to x-ray[4], reasonable suspicion justified continued detention at that point. *United States v. Gonzalez-Rincon*, 36 F.3d 859, 863 (9th Cir. 1994); *United States v. Vega-Barvo*, 729 F.2d 1341, 1349 (11th Cir. 1984). Once the agents possess reasonable suspicion, they do not need the Defendant's consent to detain him and search for contraband. *United States v. Soldarriaga-Marin*, 734 F.2d 1425 (11th Cir. 1984). Taken in their totality, the facts supported a reasonable suspicion that the Defendant was an alimentary canal smuggler. *United States v. Onumonu*, 967 F.2d 782, 789 (2nd Cir. 1992); *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1363 (11th Cir. 1984). Had the Defendant not consented to the x-ray, the evidence would have inevitably been discovered at the hospital. *United States v. Mosquera-Ramirez*, 729 F.2d 1352, 1357 (11th Cir. 1984).

10. The length of detention to facilitate the passing of the pellets was not violative of the Defendant's rights. *United States v. Henao-Castano*, 729 F.2d 1364, 1366 (11th Cir. 1984).

---

[4] In Custom's eyes, almost all people who refuse to be x-rayed are carrying narcotics. *United States v. Odofin*, 929 F.2d 56, 59 (2nd Circ. 1991).

4

11. The Defendant's statement given on July 7, 2000 was freely and voluntarily made.

WHEREFORE, Defendant's Motion to Suppress is **DENIED**.

DONE AND ORDERED in Chambers at Fort Lauderdale, Broward County, Florida, this 25 day of August, 2000.

WILLIAM P. DIMITROULEAS
United States District Judge

cc:
Daryl Wilcox, AFPD
Jeff Kay, AUSA

5